**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

KIMBERLY OWENS-PEARSON, et al.,

Plaintiffs,

v.

CITY OF MEMPHIS, MEMPHIS CITY COUNCIL, and JANA SWEARENGEN-WASHINGTON,

Defendants.

No. 2:26-cv-03358-TLP-tmp

JURY DEMAND

**ORDER GRANTING IN PART MOTION FOR TEMPORARY RESTRAINING ORDER**

## INTRODUCTION

City Council members have a tricky job. They must hold open meetings where they make hard decisions on controversial topics. The citizens they represent often have strong opinions on those topics. The First Amendment protects citizens' rights to speak and voice those opinions. In fact, the right to speak on political issues is central to First Amendment protections. Meanwhile city council members may set reasonable parameters to maintain decorum for their meetings. So government officials conducting public meetings must balance the right to free speech with the need for reasonable decorum. The questions here are whether the Memphis City Council struck the right balance when it (1) prohibited members of the public from attending future meetings and (2) issued written rules for Speech and Decorum restricting certain speech.

Plaintiffs Kimberly Owens-Pearson, Justin J. Pearson, LaJuana Abraham, Jasmine Bernand, Amber Sherman, and KeShaun Pearson[1] sued here and moved for a temporary restraining order ("TRO") on October 14, 2026. (ECF Nos. 1, 2.) Plaintiffs allege that Defendants Memphis City Council ("the Council"), the City of Memphis, and Council Chairwoman Jana Swearengen-Washington violated their first amendment rights. In short, Defendants allegedly banned Plaintiffs from attending the Memphis City Council Meeting scheduled for October 20, 2026, at 4:00 p.m. (ECF No. 1 at PageID 1–2.) Plaintiffs' Motion seeks an order from the Court lifting the ban and enjoining Defendants from enforcing their Speech and Decorum Policy.[2] The Court held a status conference with the parties on October 16, 2026, and a hearing on October 19, 2026, during which counsel discussed their positions on the Motion. (ECF Nos. 17 and 29.) For the reasons below, the Court **GRANTS IN PART** the Motion for a TRO.

## BACKGROUND

This is a First Amendment case about the content of the Memphis City Council's ("the Council") Speech and Decorum Policy and how Defendants applied it to Plaintiffs. The Council regularly meets on the first and third Tuesday of each month. (ECF No. 1-9 at PageID 42–43.) These meetings cover city business such as the passage of ordinances, recommendations from the mayor, and public hearings. (*Id.*) At the end of the Council's regular business on the agenda, it reserves time for public comment. (*Id.* at PageID 46.)

[1] To distinguish between Justin J. Pearson and KeShaun Pearson, the Court will refer to Justin J. Pearson as Representative Pearson and KeShaun Pearson as Mr. KeShaun Pearson.
[2] Plaintiffs refer to this policy as the "Speech Restriction Policy." (ECF No. 2 at PageID 70.) This term, however, does not appear anywhere in Defendants' Rules of Procedure. Defendants' counsel referred to the policy during the status conference as the "Speech and Decorum Policy." The Court will thus use this term when describing the policy. When referring to the general rules of procedure, the Court will simply refer to them as the Rules of Procedure.

But those wishing to speak during this period must follow certain conditions. For example, Section 32 of the Council's Rules of Procedure requires speakers to sign in with the Sergeant at Arms by listing their name and the subject matter of what they will talk about. (*Id.*) Section 32 also directs the Chairperson to make the following statement at the beginning of the public comment period:

> As a reminder, these meetings are for official business of the council and are held in public, not as a meeting with the public. Citizens may address the Council as a matter of legislative grace and not as a matter of right. Any person wishing to speak is expected to reflect a total sense of respect for the office held by those assembled to conduct business. Speakers shall be courteous to one another, to any member of the administrative staff, as well as persons who may address the Council. Each speaker must state their name and home address for the record. Speakers are respectfully asked to refrain from using names of city personnel or elected officials, particularly when lodging a complaint. Speakers will not be permitted to engage in gossip, make defamatory comments, or use abusive or vulgar language. The Chairperson shall have the authority to revoke the permission granted to any individual to speak if any such individual is disruptive or does not adhere to Council rules. A continued disturbance may result in removal from the Council Meeting or possible removal from the Council Meeting. Each Speaker will have no more than two minutes to speak.

(*Id.*)

The Council's comment request cards contain a similar warning in bold red at the top of the sheet:

> By requesting permission to address the Council I agree that my participation in the Council's proceedings as a member of the audience or as a participant is a privilege and not a right and my participation is expressly conditioned on doing so in an orderly manner and without personal, impertinent, slanderous, or profane remarks to any member of the Council, staff, or general public. I also acknowledge that the right of the Council or its chairperson to suspend any person from further audience before the Council at the discretion of the chairperson, who makes such remarks, or who utters loud, threatening, personal, or abusive language, or engages in any other disorderly conduct which disrupts, disturbs, or otherwise impedes the orderly conduct of any Council meeting. I understand and agree that Chairperson of the Council may maintain order by giving any persons who are in violation of the above stated rules of decorum a warning to cease any violative conduct, an order to leave the Council's chambers, or by giving an order for security personnel to remove any disruptive person from the Council's chambers who refuses to leave voluntarily.

(ECF No. 1-8 at PageID 34.) Plaintiffs assert that they regularly attend Council meetings. (ECF Nos. 2-5–2-10.) They claim that the Council rarely, if ever, enforces the Speech and Debate Policy against people who praise officials; they punish only those who criticize members of the Council. (*See, e.g.*, ECF No. 2-7 at PageID 116.) After Plaintiffs attended a City Council Meeting on October 6, 2026, they learned that Defendants had banned all Plaintiffs except Owens-Pearson from attending the next meeting scheduled for October 20. Plaintiffs attached letters citing the Council's Speech and Decorum Policy to support the decision to prohibit their attendance at two scheduled meetings. (ECF Nos. 1-10–1-14.)

On October 6, 2026, Plaintiffs attended a City Council Meeting where the Council scheduled a vote on a controversial subject—an AI Data Center moratorium. (ECF No. 1 at PageID 10.) Plaintiffs are leaders and community organizers in Memphis, Tennessee. (*Id.* at PageID 4.) Justin Pearson is also a representative for District 86 of the Tennessee House of Representatives. (*Id.* at 4–5.) The parties estimate that over four hundred people attended the October 6 meeting. (*Id.* at PageID 11; ECF No. 22 at PageID 166.) The Court watched a video of the entire meeting and many video clips provided by the parties related to the aftermath of the meeting.

The meeting itself was contentious but does not appear to be out of control. As the members of the City Council voiced their views, some audience members cheered or jeered at certain points. The Council members were able to quiet the crowd during the debate portion of the meeting. There were a couple of times when the crowd broke into a chant for a few seconds. These disruptions drew warnings from Council Chairwoman Swearengen-Washington or other Council members. But the Council continued to debate[3] and vote on a proposal to "hold" the

[3] At times Council members interrupted each other.

question of a moratorium. The Council voted to delay the moratorium vote until October 20, 2026, and Ms. Swearengen-Washington, the Council's chairperson, gaveled the meeting into recess without public comment. At the point when she called for the recess, the audience was getting restless, but it had not begun the disturbance.

What happened after the vote is less clear. Defendants provided clips and screenshots of the scene, but none captured the event from start to finish. Ms. Swearengen-Washington asserts that, within minutes of the result Ms. Sherman shouted, "I told ya'll Cooper Sutton, [one of the Council members], was full of Sh*t–she did all that talking and voted against it." (ECF No. 23 at PageID 181.) Ms. Swearengen-Washington then claims that "Councilwoman Cooper-Sutton responded[] by advising Ms. Sherman that she was not afraid to defend herself against Ms. Sherman's threats." (*Id.*)

But a video of the incident shows Ms. Cooper-Sutton's behavior likely contributed to the disturbance. She stood and replied to Ms. Sherman, "I ain't no coward. You pipe down baby. I clap back." Another video clip shows Ms. Cooper-Sutton screaming about Councilman Smiley confusing people while Councilmen Canale and Logan escort her out of the room.[4] Shortly after this incident the videos show that the crowd started to stir. A few moments later, Ms. Sherman called out to the audience about Ms. Cooper-Sutton's conduct and future elections. The audience members then started getting up with some people calling out or exchanging words with Council members. Then someone (likely Ms. Bernard) leads a chant with a bullhorn. A large section of the crowd joins in the chant. The disturbance had begun.

---

[4] Ms. Sherman alleges that Ms. Cooper-Sutton tried to charge at her before leaving the chamber. (ECF No. 2-9 at PageID 129.)

Ms. Swearengen-Washinton tried to gavel the meeting back to order but the crowd ignored her. A video clip shows Representative Pearson standing to the side and talking with Council members Warren and Smiley while this was happening. Another video shows Representative Pearson addressing the crowd with a bullhorn.[5] The commotion appears to have died down at this point, and Representative Pearson challenges the group saying that their work is not done and concludes his remarks with "Let's go, y'all," while pointing to the exit. The video then cuts to the crowd streaming out of the Council chamber singing with Representative Pearson.

In her Declaration, Ms. Swearengen-Washington refers to the post-meeting disturbance as a "riot."[6] (ECF No. 23.) She testified that the protests "appeared to be continuing at the same level" for more than thirty minutes. (ECF No. 23 at 182.) She claims that she "personally observed LJ Abraham, Amber Sherman, Keshaun Pearson, and Brandi Price, actively participating in the riot by raising their fists and yelling slogans like "power to the people." (*Id.*) Ms. Price is not a Plaintiff in this case. Ms. Swearengen-Washington also maintains that she saw Ms. Abraham, Ms. Sherman, Mr. Keshaun Pearson, and Ms. Price "actively encouraging persons in the audience to continue and even ramp up their disorderly conduct." (*Id.*) (Perhaps she did not see her own colleague, Ms. Easter-Thomas, standing and raising her hand with her thumb raised upward as the crowd chanted about power to the people. This is shown in at least one video.) Ms. Swearengen-Washington asserts that the Memphis Police Department "did not physically engage with protestors due to their large number" and that the length of the protests prevented the Council from taking up other items on the agenda. (*Id.* at 182.) A CNN news clip

[5] It is unclear when this happens, but it appears to be at the end of the protest.
[6] Counsel for Memphis City Counsel and Ms. Swearengen-Washington stated at the status conference that the crowd went "berserko" and compared the event to January 6, 2021.

provided by Defendants states that two women got into a fight in the lobby (not Plaintiffs), but the clip also reports that a Memphis Police spokesperson said nobody was detained or harmed.

After the protest, Ms. Swearengen-Washington "instructed [her] staff to positively identify any person who actively participated in the riot." (*Id.* at 183.) She claims that her staff "showed [her] video evidence of all persons they could positively identify to [sic] were engaged in disruptive conduct," and that she decided to ban each of them. (*Id.*) These people were Plaintiffs and Ms. Price. (*Id.*) Ms. Swearengen-Washington then states that she made the decision to prohibit them from attending the next two regular meetings[7] of the City Council "as a result of their disruptive behavior on October 6, 2026."[8] (*Id.*) All banned Plaintiffs except for Mr. KeShaun Pearson then received letters informing them of the ban. (ECF Nos. 1-10–1-13). Plaintiffs claim that Mr. KeShaun Pearson did not receive a letter but "was informed that he has been banned from the upcoming October 20, 2026 meeting." (ECF No. 1 at PageID 11.) The second paragraph of the letters refers to the Speech and Decorum Policy.

> While all are welcome to let their voices be heard, any use of abusive, profane language, personal remarks to any member of the Council or the public, or any

[7] Ms. Abraham's and Ms. Bernard's letters state they are banned from the October 8 and October 20 meetings, and Representative Pearson's and Ms. Sherman's letters state they are banned from the October 20 and November 10 meetings. (ECF No. 1-13 at PageID 66.)

[8] At the hearing on October 19, 2026, the Court learned from Defense Counsel that City Council Chair Swearengen-Washington had also prohibited Council member Cooper-Sutton from attending the next two council meetings. Counsel suggested that Ms. Swearengen-Washington decided to suspend Ms. Cooper-Sutton at the same time she suspended Plaintiffs. But Ms. Swearengen-Washington's Declaration failed to mention Ms. Cooper-Sutton's suspension. (ECF No. 23.) Nor did Defense Counsel mention her suspension at the hearing on October 16. Defense Counsel later clarified that Ms. Cooper-Sutton's suspension will not prohibit her from attending the City Council Meetings on October 20 and November 10. (ECF No. 31.) But the suspension will keep her from fulfilling her roles with committee meetings (Libraries and Neighborhood Improvement committee or as Vice Chair of Public Services, Arts and Youth Initiatives Committee) for the next two weeks. (*Id.*) The timing here raises questions. If Ms. Swearengen-Washington had already chosen to suspend Ms. Cooper-Sutton for making "disruptive verbal remarks… at the October 6, 2026, Regular Council Meeting," why did she omit that information from her Declaration? (See ECF No. 23 and ECF No, 31-1.)

> disorderly conduct that disrupts the meeting will not be tolerated. Thus, the intent of this letter serves as your written notice that such behavior is prohibited and should not be engaged in during meetings of the Memphis City Council. As a result of your disruptive behavior, your attendance at the Council Meetings is prohibited for the next two meeting date (10/8 and 10/20).[9] Further failure to adhere to the Rules of Decorum could result in banning your attendance at subsequent Council meetings.

(*See e.g.*, ECF No. 1-10.) Ms. Swearengen-Washington asserts that she alone made the decision to sanction the Plaintiffs and she believes that "anyone that would actively engage in such disorderly and disruptive conduct that was highly likely to repeat the conduct to shut down the next two . . . Council meetings where the data center moratorium may be considered." (ECF No. 23 at PageID 183.) She maintains that the ban was based "solely on the named person's conduct in disrupting the October meeting and was not based on prior history or the content of their speech." (*Id.*) And Ms. Swearengen-Washington points out that she voted against the moratorium, the same position taken by the protestors. (*Id.*)

The City Council met again on October 8, 2026. Three Plaintiffs attended that meeting and spoke about the Data Center Moratorium. (ECF No. 26.) There were no disturbances at that meeting. At the hearing on October 19, 2026, Defense Counsel asserted that the reason they let Plaintiffs attend and speak was that their followers did not attend. He then added that if they come back to the October 20 or November 10 meetings and the Council either votes no on the moratorium or votes to hold the moratorium question until a later meeting, Plaintiffs and their followers will erupt into chaos again.

[9] As stated above, two Plaintiffs are banned from the City Council Meeting on October 20, 2026, and November 10, 2026.

Plaintiffs maintain that Defendants' Speech and Decorum Policy is facially unconstitutional and unconstitutional as applied to the banned Plaintiffs. (ECF No. 1 at PageID 12–17.) The Plaintiffs also allege that Defendants engaged in unconstitutional retaliation for Defendants' protected activity and selectively enforced their Speech and Decorum Policy in violation of the Equal Protection Clause. (*Id.* at PageID 16–18.) Plaintiffs seek a TRO for the Court enjoining Defendants from enforcing their ban on Plaintiffs' attendance at the meeting October 20, 2026, City Council Meeting and enjoining Defendants from enforcing its Speech and Decorum Policy. (ECF No. 2 at PageID 69–70.)

## LEGAL STANDARDS

### I. Temporary Restraining Order

A TRO is an extraordinary remedy. Courts issue TROs to "preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996). The movants bear the burden of showing they are entitled to a TRO. *See Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009). Courts consider TRO motions under the same four-factor test for preliminary injunction motions: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable harm absent a TRO; (3) whether granting a TRO would cause "substantial harm" to others; and (4) whether the public interest would be served by the issuance of a TRO. *See Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). These are not "prerequisites" but rather "interrelated considerations that must be balanced together." *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006).

"The necessary showing for any one factor turns on the strength of the plaintiff's showings for the other factors." *PCC Airfoils, LLC v. Daughtery*, 176 F.4th 509, 513 (6th Cir. 2026).

## II. Standing

Article III of the United States Constitution provides federal courts with "judicial power." U.S. Const. art. III, § 1. But this "grant of authority does not allow courts to . . . preemptively screen[] all new laws passed by democratically elected legislators." *Tennessee Conf. of the NAACP v. Lee*, 139 F.4th 557, 562 (6th Cir. 2025) (citation omitted). Rather, the Constitution limits a federal court's jurisdiction to only "Cases" and "Controversies." U.S. Const. art. III, § 2. To ensure compliance with this requirement, courts have developed the standing doctrine to limit who can sue to enforce a right. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 379 (2024) (citation omitted).

Three well-known elements govern standing analysis. A plaintiff must show "(i) that [it] has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA*, 602 U.S. at 380 (citation omitted).

An injury in fact must be "concrete" and "particularized." *Id.* at 381 (citation omitted). It must be more than an ideological offense or harm, no matter how deeply held the plaintiff's belief or conviction. *Id.* ("Nor may citizens sue merely because their legal objection is accompanied by a strong moral, ideological, or policy objection to a government action."). To show causation, a plaintiff must show that the defendant's conduct caused, or likely will cause, the plaintiff's injury. *Id.* The final element, redressability, asks whether a court can order relief that would resolve the plaintiff's injury. *See id.* at 380. This often overlaps with causation

because if a defendant caused an injury, "enjoining the action or awarding damages for the action will typically redress that injury." *Id.* at 380–81.

Defendants do not argue that Plaintiffs lack standing. And that is likely for good reason. It takes little, if any, discussion to see why these Plaintiffs satisfy the three elements that form the "irreducible constitutional minimum" for Article III standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted); *cf. Kitchen v. Whitmer*, 106 F.4th 525, 534–35 (6th Cir. 2024) ("Kitchen suffered an injury (being kept in prison without parole) that is traceable to Defendants (who oversee enforcement of Michigan's parole statute) and is redressable by a ruling ordering a parole hearing[.]").

Plaintiffs filed declarations noting that they received letter from Memphis City Council Chairwoman Swearengen-Washington prohibiting them from attending two future Council meetings. (ECF No. 2-5–2-10.) Plaintiffs also attached the letters to their Complaint. (ECF No. 1-10–1-14.) The letters cite a Council rule addressing speech and decorum at Council meetings. Plaintiffs' First Amendment rights to free speech and to assemble are allegedly infringed here. These are concrete and particularized harms. According to defense counsel, the sole decision-maker here was Defendant Swearengen-Washington. So the Court finds that Defendants caused the alleged harm. If the Court were to rule for Plaintiffs, that ruling would redress their injury by allowing them to exercise their First Amendment rights.

## ANALYSIS

### I. Temporary Restraining Order

Having reviewed Plaintiffs' Motion, the Court finds that they have carried their burden of proof on the four factors supporting the issuance of a TRO enjoining Defendants from enforcing the ban on Plaintiffs' attendance at the Council meeting on October 20, 2026, and enjoining the

enforcement of certain aspects of Defendants' Speech and Decorum Policy. The Court now addresses those four factors.

**A. Likelihood of Success on the Merits**

Plaintiff has shown a likelihood of success on the merits for both requested forms of relief. "When a case turns on a potential constitutional violation, 'the likelihood of success on the merits with often be the determinative factor." *Boddy v. Grech*, 178 F.4th 264, 272 (6th Cir. 2026) (quoting *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc). Plaintiffs need not "prove [their] case in full at a preliminary injunction hearing." *Certified Restoration Dry Cleaning Network, L.L.C.*, *v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (citation modified). But they "must show more than a mere possibility of success." *Six Clinics Holding Corp., II v. Cafcomp Systems*, 119 F.3d 393, 402 (6th Cir. 1997). That said, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberative investigation." *Id.* Having established the standard necessary to show likelihood of success on the merits, the Court now moves to the merits of Plaintiffs' case.

**B. First Amendment**

Plaintiffs bring multiple First Amendment claims against Defendants. (ECF No. 1.) "The First Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, prohibits governments from 'abridging the freedom of speech' and 'prohibiting the free exercise' of 'religion.'" *Ward v. Polite*, 667 F.3d 727, 732 (6th Cir. 2012); *see also De Jonge v. Oregon*, 299 U.S. 353, 364 (1937) ("Freedom of speech and of the press are fundamental rights which are safeguarded by the due process clause of the Fourteenth

Amendment of the Federal Constitution."). And "[t]he right of peaceable assembly . . . is equally fundamental." *De Jonge*, 667 F.3d at 732.

But "[t]he right to free speech is not absolute, especially when a would-be speaker seeks access to government property as a platform for his speech." *Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d 427, 432 (6th Cir. 2009). Federal courts apply "a 'forum based' approach for assessing restrictions that the government seeks to place on the use of its property." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (6th Cir. 1992). A traditional public forum is "government property that has been traditionally opened to the public for expressive activities such as public streets and parks." *United States v. Kokinda*, 497 U.S. 720, 727 (1990). "Such areas occupy a 'special position in terms of First Amendment protection' because of their historic role as sites for discussion and debate." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014). Any content restrictions on speech in traditional public forums must satisfy strict scrutiny. *Id.* at 478. A designated public forum is "government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009). These forums "are subject to the same strict scrutiny as restrictions in a traditional public forum." *Id.* at 469–470.

Nonpublic and limited public forums have much less speech protections than traditional and designated public forums. Nonpublic and limited public forums are government "properties that are 'not by tradition or designation a forum open for communication.'" *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 978 F.3d 481, 491 (6th Cir. 2020) (quoting *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 11 (2018). There are "two limits on the government's ability to restrict speech in these forums." *Id.* Such restrictions must be

"viewpoint neutral and reasonable in light of the purpose served by the forum." *United Food & Com. Workers Loc. 1099 v. City of Sidney*, 364 F.3d 738, 746 (6th Cir. 2004).

A city council meeting is a limited public forum. *See Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 519 (6th Cir. 2019). So Defendants have the power to set restrictions on speech at City Council Meetings so long as the limitations are reasonable and viewpoint neutral. The Court finds that Plaintiffs will likely be able to show that Defendants' decision to ban Plaintiffs from attending the October 20 meeting is not reasonable. The Court also finds that Plaintiffs can likely succeed on their claim that the Speech and Decorum Policy discriminates against viewpoint.

**C. Defendants' October 20 Meeting Ban**

Plaintiffs allege that the October 20 meeting ban is unreasonable.[10] Prospectively banning people from attending limited public forums because of earlier disruptive behavior implicates the reasonableness prong of the limited public forum test. *See Reza v. Pearce*, 806 F.3d 497, 505 (9th Cir. 2015). When determining whether a restriction on speech is reasonable

[10] Plaintiffs sued here on October 14, 2026, and moved for a Temporary Restraining Order related to the Memphis City Council's decision to prohibit them from attending upcoming council meetings and restrictions in the Council's Speech and Decorum Policy. (ECF Nos. 1 and 2.) Two days later, the Court held a conference with counsel and Defendants responded in opposition on October 17, 2026. (ECF Nos. 22–24.) Based on Defendant's arguments, the Court entered a text Order the next day scheduling a hearing on October 19, 2026, to address three issues: "(1) whether Defendants' ban on Plaintiffs' attendance at the October 20, 2026, city council meeting is reasonable, (2) whether the ban constitutes an impermissible prior restraint, and (3) whether these issues are sufficiently plead in Plaintiffs' Complaint." (ECF No. 25.) At the October 19 hearing, Plaintiffs argued that paragraph 92 in the Complaint sufficiently alleged that the ban violated the "reasonableness" prong of the limited public forum doctrine and that the ban is an impermissible prior restraint. Defense counsel responded that "Defendants assert that the Complaint fails to articulate a claim challenging the suspension on prior restraint grounds. Plaintiffs' prior restraint allegations are tied to the challenge to the so-called speech restriction policy." (ECF No. 31 at PageID 209.) The Court will therefore begin by addressing whether the ban or suspension is reasonable under the limited public forum doctrine.

in a limited public forum, courts must assess the restriction "in light of the purpose of the forum and all the surrounding circumstances." *Cornelius v. NAACP Legal Def. Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). "[T]he government need not show a 'strict incompatibility' between the speech it prohibits and the purpose of the forum." *Am. Freedom Def. Initiative*, 978 F.3d at 493. This means there is no requirement that the government's reasons for imposing a restriction be compelling; [t]hey need only be 'permissible.'" *Id.* The government also does not need to narrowly tailor the restriction to achieve its ends. *Id.* at 494. And limiting disruption is a reasonable end. *See Cornelius*, 473 U.S. at 811 ("The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum or hinder its effectiveness for its intended purpose.")

But the reasonableness standard is not toothless. Any discretion to enforce restrictions on speech in limited public and nonpublic forums "must be guided by objective, workable standards." *Mansky*, 585 U.S. at 16. That is, the government "must be able to articulate some sensible basis for distinguishing what must come in from what must stay out." *Mansky*, 585 U.S. at 4. For example, in *Mansky*, the Supreme Court struck down a Minnesota statute that banned voters from wearing political badges, buttons, and insignia in polling places. *Id.* at 5, 23. Like the City Council Meetings here, the Court considered polling places to be nonpublic/limited public forums.[11] *Id.* at 12. Although the Supreme Court lauded Minnesota's goal of making the polling place "an island of calm in which voters can peacefully contemplate their choices," it concluded that the restriction on political apparel was an unreasonable means to achieve that end. *Id.* at 5, 23. The Court reasoned that the term "political" was vague and open to different

[11] Although the City Council Meetings are a limited public forum, the same test applies to both nonpublic and limited public forums. *See Am. Freedom Def. Initiative*, 978 F.3d at 491.

interpretations. *Id.* at 11–12. And these interpretations gave election officials too much discretion in determining who violated the statute. *Id.* at 21–22. At bottom, the Court found that such an "indeterminate prohibition" created an "opportunity for abuse" and inconsistent enforcement. *Id.* at 21–23.

So too here, Defendants failed to use objective, workable standards when they decided whom to exclude from the October 20 meeting. This sanction thus runs afoul of *Mansky*'s standard. For starters, the Council's Rules of Procedure provide only three possible sanctions for disruptive conduct at a meeting: (1) a warning, (2) an order to leave a meeting, and (3) if the person refuses to leave, removal from a meeting. (ECF No. 1-9 at PageID 49.) These rules contain no provision allowing the Chairperson to prospectively ban a person from attending a future meeting, let alone instructions on how such a sanction would be enforced. In fact, many provisions in the Speech and Decorum Policy explicitly limit the sanction to the current meeting. For example, the Rules state that, "Any person who conducts himself in a [disorderly or boisterous] manner shall, at the discretion of the presiding officer, be barred from further audience before the Council during *that* meeting." (*Id.* at PageID 48.) And other provisions have the same qualifying language.

Even if Defendants' Rules of Procedure allowed them to prospectively ban people from meetings, Defendants applied vague and ambiguous standards when they made those determinations here. Ms. Swearengen-Washington stated that she alone made the decision to prohibit Plaintiffs from attending future meetings. (ECF No. 23 at PageID 183.) She "determined that the Council should discipline any person who actively engaged in conduct that led to the interruption of the October 6, 2026, meeting." (*Id.*) And she told her staff "to positively identify any person who actively participated in the riot." (*Id.*) Counsel for Ms.

Swearengen-Washington and the Memphis City Council also stated at the October 16 status conference that the staff were trying to find people that were "encouraging the disorder." Like the term "political" in *Mansky*, the phrases "actively engaging," "encouraging the disorder," or "actively participating in the riot" are murky and subject to many interpretations. Using them as standards thus risks arbitrary and inconsistent enforcement.

The ruling here is not based on a constitutional technicality. There were over four hundred attendees at the October 6 meeting, and a large portion of them interrupted the proceedings. But Defendants banned only six people. And it is unclear what lines Ms. Swearengen-Washington drew to ban these people and not others. For example, a video shows two women punching each other in the lobby and neither faced a sanction here. Indeed, a reasonable person could describe Ms. Cooper-Sutton's confrontations with Ms. Sherman and other Council members on October 6 as actively engaging in conduct that led to or encouraged the disruption, perhaps even more so than Representative Pearson's speech at the end of the protest. Someone in attendance could also have interpreted Ms. Easter-Thomas's conduct as encouraging the disorder when she stood up with her hand and thumb raised upward as the crowd chanted "power to the people." Ms. Cooper-Sutton is suspended from her committee duties (but not from attending Council meetings) for thirty days. The circumstances of this suspension remain unclear. (*See ante* at 7 n.8.) Meanwhile, Ms. Easter-Thomas faced no repercussions from Defendants.

Other aspects of the decision-making process are problematic. For example, Ms. Swearengen-Washington was the only person who made the decisions of whom to ban, and she made those choices by using her own vague standards. She also made all her decisions after looking at the video footage post hoc rather than institute the bans when the disruptions

happened. Not only does this make the decision-making process more susceptible to post hoc rationalizations, but it also makes standards harder to apply. That is, it is tougher for the Council to know when a ban is necessary to prevent future disruption than to sanction current disruptive conduct.[12]

Take Ms. Swearengen-Washington's use of the term "riot" to describe the events of October 6, 2026. She was the person with sole discretion to decide the fate of those in attendance. And she saw the commotion as a "riot." But how does one define a riot? As noted above, the audience members used bullhorns, made loud chants and ignored efforts to restore order. Even still, there was no property damage and there were no reported injuries. Calling the events of October 6 a "riot" is subject to debate. So what about defining one's "participation" in that riot? These concepts are hard to define without clear guidelines. Those guidelines were absent here. In short, her process for deciding whom to suspend is subject to the very abuse that *Mansky* warned against. Ms. Swearengen-Washington's approach is arbitrary and unreasonable.

To be sure, Defendants have a legitimate interest in maintaining decorum during proceedings. The Court does not condone the disruptions that happened during the October 6th meeting. And sanctioning people for bringing in bullhorns is a reasonable line to draw. But if that is the line Defendants wanted to draw, they could have drawn it on October 6. As the City Council's own rules suggest, it is better to address disruptive behavior in real time with clear guidelines, rather than by forecasting future behavior. The law requires only that the decorum rules be viewpoint neutral and reasonable. The Council Rules state that the Chairperson has the

[12] The Court is not ruling here that all prospective bans are unlawful. But when a city council imposes prospective bans, it is easier to wrongfully base that decision on an "undifferentiated fear or apprehension of disturbance [which] is not enough to overcome the right of freedom of expression." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969).

authority to warn, order to leave, and remove from the Council meeting any attendee who fails to follow the decorum rules. (ECF No. 1–9 at PageID 49.) If someone is disruptive, the Council Chairperson can address it during that meeting. Defendants' efforts to forecast and sanction Plaintiffs' future behavior lacked clear standards and was arbitrary. That three Plaintiffs attended the October 8 meeting without incident illustrates this point. And so despite the interest in keeping decorum, the prospective sanctions were unreasonable here.

**D. Defendants' Speech and Decorum Policy**

Plaintiffs have shown that they will likely show that many restrictions in Defendants' Speech and Decorum Policy impermissibly discriminate based on viewpoint. Plaintiffs allege in their Complaint that the Council's Speech and Decorum Policy facially discriminates against viewpoints. (ECF No. 1 at PageID 12.) Plaintiffs seek a declaration in their Complaint that the Speech and Decorum Policy constitutes "viewpoint discrimination and invites arbitrary enforcement." The Speech and Decorum Policy restricts individuals from using personal, impertinent, slanderous, defamatory, abusive or vulgar language, or engaging in gossip.[13] The Court finds Plaintiffs can likely show that each of these restrictions, except for the prohibition "vulgar" and "profane" language, are unconstitutional.[14]

[13] There is language in the Speech and Decorum Policy that goes to decorum such as "disrupts or otherwise impedes the orderly conduct of any Council Meeting." (ECF No. 1-8.) And it is unclear what Plaintiffs envision the Speech and Decorum Policy to cover. The Court will thus focus on the terms listed above.

[14] Plaintiffs also allege that Defendants' Speech and Decorum Policy is unconstitutionally vague, that prohibiting "defamatory" and "slanderous" language is an impermissible prior restraint, and that it is unreasonable, given the purpose of the forum. (ECF No. 1 at PageID 12–16.) Because the Court finds that restrictions on defamatory and slanderous language are unconstitutional, it will not address Plaintiff's prior restraint argument. The Court will also not directly address Plaintiff's other arguments because the analysis of whether Defendants' argument about viewpoint neutrality as to the terms "vulgar" and "profane" applies to these issues.

"In a limited public forum, the government can impose reasonable restrictions based on speech content, but it cannot engage in viewpoint discrimination." *Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 519 (6th Cir. 2019). "Impermissible viewpoint discrimination 'does not neutrally treat an entire subject as off limits,' but rather 'permits some private speech on the subject and only disfavors certain points of view.'" *Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 893 (6th Cir. 2021). Courts "use the term 'viewpoint' in a broad sense." *Matal v. Tam*, 582 U.S. 218, 220 (2017). "[V]iewpoint discrimination exists even when the government does not target a narrow view on a narrow subject and enacts a more general restriction–such as a ban on all 'religious' or on all 'offensive' speech" *Am. Freedom Def. Initiative*, 978 F.3d at 499. The government therefore cannot "censor speech merely because it is 'offensive to some.'" *Ison*, 3 F.4th at 894 (quoting *Matal*, 582 U.S. at 894).

The Supreme Court and Sixth Circuit have clarified the limitation on the government's ability to restrict offensive speech. For example, the Supreme Court in *Iancu v. Brunetti,* invalidated the Lanham's Act's prohibition on "immoral and scandalous" because the restriction "distinguished between two opposed sets of ideas: those aligned with conventional moral standards and those hostile to them." 588 U.S. 388, 394–95 (2019). In *Ison*, the plaintiff challenged a School Board's "[p]olicy's restrictions on 'personally directed,' 'abusive,' and 'antagonistic' statements." 3 F.4th at 894. The Sixth Circuit found that restrictions on these kinds of statements constitute viewpoint discrimination because "they prohibit speech purely because it disparages and offends." *Id.* And in *American Freedom Defense Initiative*, the Sixth Circuit found a government's agency's restriction on advertisements that "would hold a group of people to 'scorn and ridicule'" was unconstitutional on the same grounds. 978 F.3d at 498–501. Lastly, in *Boddy*, a school board's president seized an attendee's microphone at a meeting after

the attendee criticized the teaching of critical race theory and "took issue with the 'cowardice' of the school district's superintendent." 178 F.4th at 268. The Sixth Circuit rejected the district court's reasoning that ad hominem attacks are unprotected speech and found that the school board's action impermissibly discriminated against the attendee based on her viewpoint. *Id.* at 272–74. These cases demonstrate that governments face significant limitations on their ability to restrict uncomfortable and even unseemly speech. Having now covered the standards, the Court will evaluate each restrictions constitutionality.

Many of Defendants' restrictions fall under binding precedent as unconstitutional viewpoint discrimination. *Ison* expressly held that restrictions on "personal" and "abusive" speech are impermissible. 3 F.4th at 894.[15] Restrictions on impertinent speech and gossip also face significant constitutional hurdles. Merriam-Webster's dictionary defines "impertinent" as "given to or characterized by insolent rudeness" or "not restrained within due or proper bounds especially of propriety or good taste."[16] And its definitions of "gossip" include "rumors of information about the behavior of personal lives of other people" and "a person who habitually reveals personal or sensational facts about others."[17] In other words, these restrictions prohibit

[15] In defending the Speech and Decorum Policy's constitutionality, Defendants rely on *Murray v. City of New Buffalo*, 708 F. Supp. 3d 1313 (W.D. Mich. 2023). And Murray in turn relies on a footnote in *Ison* for the proposition that "regulations guarding against actual or ad hominem attacks, even verbal, are not permitted in a limited public forum." *Id.* at 1331 (quoting *Ison*, F.4th at 894). But *Boddy* later clarified the Sixth Circuit has "never held that an ad hominem attack is per se unprotected speech. And any indication otherwise in *Ison* is dicta. . . . Nor has the Court held that ad hominem attacks are without First Amendment protection. In fact, *Matal* and *Iancu* suggest that . . . speech is protected because giving offense is a viewpoint." 178 F.4th at 273.

[16] *Impertinent*, Merriam-Webster, https://www.merriam-webster.com/dictionary/impertinent (last visited Oct. 19, 2026).

[17] *Gossip*, Merriam-Webster, https://www.merriam-webster.com/dictionary/gossip (last visited Oct. 19, 2026).

speakers from saying negative things about the council members or the public and are thus impermissibly slanted towards viewpoint.

And the Council's restrictions on slanderous and defamatory statements are also problematic. To be sure, these are legal terms of art that must satisfy certain elements and are not protected by the First Amendment. *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964). But "slander" and "defamatory" also have lay understandings. Merriam-Webster's Dictionary defines "slander" as "the utterance of false charges or misrepresentations which defame and damage another's reputation" and it defines "defamation" as an "act of communicating false statements about a person that injure the reputation of that person."[18] And these definitions cover more speech than the strict legal terms. *Clark v. Hoops, LP*, 709 F. Supp. 2d 657, 671 (W.D. Tenn. 2010) (listing the elements of defamation in Tennessee). The requirement of viewpoint neutrality thus applies to these restrictions. And because these terms are naturally personally directed remarks, restrictions on slanderous and defamatory statements are not viewpoint neutral. *See Ison*, 3 F.4th at 894 (defining "personally directed" as "either harassing or abusive statements directed at someone individually" (citation modified)). They are therefore unconstitutional.

The Court, however, finds that Plaintiff cannot show a likelihood that they will establish that restrictions on "vulgar" and "profane" statements are unconstitutional at this stage. The Supreme Court and Sixth Circuit have not addressed whether restrictions on these statements are permissible. For example, in *Iancu*, the Supreme Court rejected the government's attempt to construe the restriction on "immoral and scandalous" trademarks to marks that were vulgar,

---

[18] *Slander*, Merriam-Webster, https://www.merriam-webster.com/dictionary/slander (last visited Oct. 19, 2026); *Defamation*, Merriam-Webster, https://www.merriam-webster.com/dictionary/defamation (last visited Oct. 19, 2026).

lewd, sexually explicit or profane. 588 U.S. at 397; *see also Am. Freedom Def. Initiative*, 978 F.3d at 501 (declining to address the constitutionality of prohibitions on "vulgar" or "profane" speech in nonpublic forums). The Court also recognizes Defendants' interest in maintaining decorum during City Council proceedings. Given the extraordinary nature of a TRO, the Court will not pass on the constitutionality of such restrictions without considered briefing from the parties. *See Montgomery v. Carr*, 848 F. Supp. 770, 775 (S.D. Ohio 1993) ("At the preliminary injunction stage, a district court is not required to resolve 'doubtful or difficult questions law or disputed questions of fact.") The Court will thus enjoin Defendants from enforcing their Speech and Decorum policy as to the terms personal, impertinent, slanderous, defamatory, abusive, and gossip, but not as to the terms vulgar and profane.

**E. Irreparable Harm**

Irreparable harm is an "indispensable" requirement before a court can issue an injunction. *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019). Harm is irreparable "if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). And to show irreparable harm, the movant must allege harm that is "both certain and immediate, rather than speculative or theoretical." *Brown v. Greene Cnty. Vocational Sch. Dist. Bd. of Educ.*, 717 F. Supp. 3d 689, 696 (S.D. Ohio 2024) (citing *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)). "When constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).

Plaintiffs argue that they will suffer irreparable harm if they are banned from attending the October 20 meeting because the ban would "depriv[e] them of the opportunity to engage in protected expression, address their elected representatives, and participated in public comment

on matters of significant public concern." (ECF No. 1 at PageID 89.) Plaintiffs also maintain that the Speech and Decorum Policy leads to self-censorship, "[o]nce a commenter has refrained from speaking at a particular meeting, the opportunity to participate in that proceedings, address matters before the Council, and contribute to public debate at that moment is permanently lost." (*Id.* at PageID 90.)

Plaintiffs have shown that the likelihood of irreparable harm is high. The harm is certain and imminent because the Plaintiffs will suffer an injury to their First Amendment rights if Defendants do not lift their ban immediately. And as stated above, Plaintiffs have sufficiently alleged a credible threat of enforcement of the Speech and Decorum Policy. The loss of Plaintiffs' First Amendment rights cannot be repaired after the fact. And so the Court finds this factor weighs heavily in favor of Plaintiffs.

**F. Balance of the Equities**

When deciding whether to grant TROs, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing reference omitted). "In a balance between two important interests – free speech on one hand, and the state's power to maintain peace on the other – the scale is heavily weighted in favor of the First Amendment. *Bible Believers v. Wayne County*, 805 F.3d 228, 252 (6th Cir. 2015).

Defendants argue that the others will suffer irreparable injury if the Court grants the TRO. (ECF No. 22 at PageID 175–76.) They claim that allowing Plaintiffs to attend the meeting would jeopardize the public safety and risk disruption. (*Id.*) The Court acknowledges Defendants' concerns about disruption. But as stated above, Defendants have not sufficiently articulated why Plaintiffs were the ones who were banned. And the fact that some Plaintiffs

attended the October 8 City Council Meeting two days after the protest without incident undercuts Defendants' disruption arguments. And nothing in the TRO prevents Defendants from enforcing the decorum rules during the meeting. They just cannot do it arbitrarily and based on viewpoint. The Court thus finds the balance of the equities favors Plaintiffs.

**G. Public Interest**

Finally, the Court finds that granting the TRO enjoining Defendants from enforcing the October 20 ban and their enforcement of certain parts of the Speech and Decorum Policy furthers the public interest. "[I]t is always in the public interest to prevent a violation of an individual's rights." *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 407 (6th Cir. 2017). As stated above, Plaintiffs have established that the October 20 ban and parts the Speech and Decorum Policy violate their First Amendment rights. The public has an interest in orderly City Council Meetings, but "the public interest also favors an unbridled marketplace of ideas, especially when those ideas are unpopular or critical of a government official." *Boddy*, 178 F.4th at 264. This factor thus also weighs in Plaintiff's favor.

## CONCLUSION

The Court therefore **GRANTS IN PART** Plaintiffs' Motion for Temporary Restraining Order and **ENJOINS** Defendants from:

1. Enforcing their notice to ban or suspend Plaintiffs from attending Memphis City Council Meetings for the next fourteen (14) days, and
2. Enforcing the Memphis City Council Rules of Procedures restrictions as to the terms below: (1) personal, (2) impertinent, (3) slanderous, (4) defamatory, (5) abusive, and (6) gossip for the next fourteen (14) days.

**SO ORDERED**, this 20th day of October, 2026.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE